**GENERAL ELECTRIC COMPANY,**
**Plaintiff,**

v.

**UNITED STATES, Defendant,**

**Federal–Mogul Corporation and**
**the Torrington Company,**
**Defendant–Intervenors.**

**Court No. 91–08–00588.**

United States Court of
International Trade.

Sept. 29, 1992.

See also 788 F.Supp. 1225.

McKenna & Cuneo, Peter Buck Feller and Lawrence J. Bogard, Washington, D.C., for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, Velta A. Melnbrencis, of counsel, Stephen J. Claeys, Attorney–Advisor, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, D.C., for defendant.

Frederick L. Ikenson, P.C., Frederick L. Ikenson, J. Eric Nissley and Joseph A. Perna, V, Washington, D.C., for Federal–Mogul Corp.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., Geert de Prest, Christopher J. Callahan and John M. Breen, Washington, D.C., for The Torrington Co.

## OPINION

TSOUCALAS, Judge:

Plaintiff, General Electric Company ("GE"), moves pursuant to Rule 56.1 of the Rules of this Court for judgment on the agency record alleging that the Department of Commerce, International Trade Administration's ("ITA") failure to act on GE's application for access to business proprietary information under an administrative protective order ("APO") denied GE a meaningful opportunity to participate in the administrative review at issue in this case. GE further alleges that, as a result of GE's inability to fully participate in the administrative review, the ITA incorrectly calculated the assessment of dumping duties on GE's imports of antifriction bearings from Japan.

The administrative determination at issue here is the ITA's final results in *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan; Final Results of Antidumping Duty Administrative Reviews* ("*Final Results*"), 56 Fed.Reg. 31,754 (1991).

### Background

GE is a United States importer of ball bearings and cylindrical roller bearings pro-

duced in Japan by the NTN Corporation ("NTN"). As such, GE requested an administrative review of its imports of such bearings from Japan produced by NTN. Administrative Record Japan Public Document ("AR Jap.Pub.Doc.") 13.

On June 1, 1990, the ITA initiated an administrative review of imports of ball bearings, cylindrical roller bearings, spherical plain bearings and parts thereof from Japan. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand and the United Kingdom Initiation of Antidumping Administrative Reviews*, 55 Fed. Reg. 23,575 (1990). The period of review was November 9, 1988 through April 30, 1990. *Id.* NTN's exports of antifriction bearings to GE were covered by this review. *Id.*

On June 1, 1990, the ITA transmitted section A of its questionnaire to all producers of antifriction bearings subject to this review, including NTN. AR Jap.Pub.Doc. 39. Section A defined "date of sale" for purposes of determining whether a particular sale fell within the review period as:

> typically the purchase order date, the contract date, or, where written confirmation is given, the order confirmation date (*i.e.*, the point in the transaction where the basic terms of the contract, particularly price and quantity, are agreed to by the parties involved). In the case of a long-term contract or a "requirements" contract, the date of sale is the date of the contract. If terms of sale are subject to change, and do in fact change, up to, or even subsequent to, the date of shipment, then the date of the agreement to the new terms of sale or the date of shipment may be the appropriate date of sale.

*Id.*

NTN submitted its section A questionnaire response on June 28, 1990. AR Jap. Pub.Doc. 124. In its response, NTN stated that certain customers request quotations for individual orders. NTN responds with a quotation and these customers accept by issuing a single purchase order. *Id.* In addition, in regard to long-term contracts, NTN stated:

> United States sales are more formalized and are based upon sales that occur prior to shipment. In the case of large original equipment manufacturers, a formal long-term contract (i.e., more than one year) may exist between the parties, which contract reflects important terms of sale including price and quantity requirements, terms of delivery, etc. Where such a formal contract exists, the date of acceptance of the contract is ordinarily regarded as the date of sale for purposes of responding to this questionnaire.

*Id.*

On June 19, 1990, counsel for GE submitted an application for disclosure of NTN's business proprietary information subject to an APO. AR Jap.Pub.Doc. 67. ITA never acted on this application. There is no evidence in the administrative record that GE ever raised the issue of the status of its APO application with the ITA after submitting the initial application. As a result, GE was never granted access to NTN's business proprietary information.

On July 30, 1990, the ITA issued the remaining sections of its questionnaire to producers of antifriction bearings. Administrative Record General Public Document 3. Section B of the questionnaire dealt with NTN's sales in the United States. Section B's instructions stated:

> SALE DATE
> a. See glossary for definition of Sale Date. Explain how you determined the date of sale for your sales. Report the date of confirmed order, unless your sales contract had a price escalator clause keyed to the date of shipment. In that case, show the date of shipment.

*Id.* The glossary definition of sales date is the same as the definition cited above in section A. *Id.* GE alleges that its "long-term contracts with NTN did include price escalator clauses, but these clauses were keyed to annual changes in defined economic indicators. Hence, ITA's instruc-

tions with respect to shipment dates as dates of sale were irrelevant to NTN's sales to GE." *Plaintiff's Memorandum in Support of Motion for Judgment upon the Agency Record ("Plaintiff's Memorandum")* at 9.

Based on NTN's public submissions during the administrative review, GE assumed "from the phrasing of ITA's questions and definitions, and NTN's public responses, that NTN had reported the dates of its long-term contracts with GE as the dates of its sales to GE, and had only reported transactions to ITA that were made pursuant to long-term contracts entered into during the period covered by the review." *Plaintiff's Memorandum* at 10–11.

On March 15, 1991, the ITA published its preliminary determination in the administrative review for NTN. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts thereof from Japan; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Antidumping Duty Administrative Reviews ("Preliminary Results")*, 56 Fed.Reg. 11,186 (1991). The margin calculated for NTN's ball bearings was 7.23% and the margin for NTN's cylindrical roller bearings was zero percent. *Preliminary Results*, 56 Fed.Reg. at 11,189. GE never requested a disclosure conference with the ITA to discuss the details of the ITA's margin calculations in regard to GE's imports.

On February 7, 1991, NTN submitted new tapes and computer printouts correcting clerical errors in its earlier sales submissions. AR Jap.Pub.Doc. 657. GE alleges that the revised date of sale information provided by NTN was incorrect in regard to some of NTN's sales of antifriction bearings to GE. GE alleges that NTN reported dates of sale within the period of review for certain purchase orders when the correct dates of sale were approximately eighteen months earlier, *i.e.*, before the period of review. GE alleges that the dates of sale reported by NTN were "merely the date on which the annual price escalation clause—tied to factors beyond the control of the parties—in the original purchase or-

ders took effect." *Plaintiff's Memorandum* at 12–13.

On April 11, 1991, GE submitted its case brief in this proceeding which discussed only general issues. AR Jap.Pub.Doc. 851. The failure of the ITA to act on GE's application for an APO and allow access to NTN's business proprietary information was not raised.

On July 11, 1991, the ITA published the final results of the administrative review which assigned NTN a weighted-average dumping margin of 14.23% for ball bearings and 15.82% for cylindrical roller bearings. *Final Results*, 56 Fed.Reg. at 31,756.

### Discussion

The Court's jurisdiction over this matter is derived from 28 U.S.C. § 1581(c) (1988).

A final determination by the ITA in an administrative proceeding will be sustained unless that determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is relevant evidence that "a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *Alhambra Foundry Co. v. United States*, 12 CIT 343, 345, 685 F.Supp. 1252, 1255 (1988).

*The Administrative Protective Order Application*

█ GE is a U.S. importer of antifriction bearings subject to the contested review. As such, GE is an interested party to the proceeding and could request an administrative review of its imported antifriction bearings. 19 U.S.C. § 1677(9)(A) (1988); 19 C.F.R. § 353.2(k)(1) (1991); 19 C.F.R. § 353.22(a)(3) (1991). As an interested party, GE had a right to fully participate in the administrative review of its imports.

In the course of an administrative review, interested parties often require access to the business proprietary information submitted by other interested parties in order to effectively participate in the proceeding. Access to business proprie-

tary information is governed by 19 U.S.C. § 1677f(c) (1988 & Supp. II 1990) which states in relevant part:

**(c) Limited disclosure of certain proprietary information under protective order**

**(1) Disclosure by administering authority or commission**

**(A) In general**

Upon receipt of an application (before or after receipt of the information requested) which describes in general terms the information requested and sets forth the reasons for the request, the administering authority or the Commission *shall* make all business proprietary information presented to, or obtained by it, during a proceeding (except privileged information, classified information, and specific information of a type for which there is a clear and compelling need to withhold from disclosure) available to interested parties who are parties to the proceeding under a protective order described in subparagraph (B), regardless of when the information is submitted during a proceeding.

. . . .

**(C) Time limitation on determinations**

The administering authority or the Commission, as the case may be, *shall determine whether to make information available* under this paragraph—

(i) not later than 14 days . . . *after the date on which the information is submitted,* or

(ii) if—

(I) the person that submitted the information raises objection to its release, or

(II) the information is unusually voluminous or complex,

not later than 30 days . . . after the date on which the information is submitted.

. . . .

**(2) Disclosure under court order**

If the administering authority *denies* a request for information under paragraph (1), then application may be made to the United States [Court of International Trade] for an order directing the administering authority or the Commission to make the information available.

(Emphasis added); *see* 19 C.F.R. § 353.34 (1991).

The U.S. Court of International Trade has exclusive jurisdiction over "any civil action involving an application for an order directing the administering authority . . . to make confidential information available under [19 U.S.C. § 1677f]." 28 U.S.C. § 1581(f) (1988). In addition, a civil action contesting a denial of an application for access to proprietary information must be commenced "within ten days after the date of the *denial* of the request for such confidential information." 28 U.S.C. § 2636(f) (1988) (emphasis added).

This Court has stated that "[i]t is clear that the statute specifically imposes a duty of disclosure upon the [ITA], unless the [ITA] can meet the exception for 'privileged information, classified information, and specific information of a type for which there is a clear and compelling need to withhold from disclosure.' " *Allied Tube & Conduit Corp. v. United States*, 13 CIT 698, 703, 721 F.Supp. 305, 310 (1989), *aff'd,* 898 F.2d 780 (Fed.Cir.1990); *see also Komatsu Forklift Mfg. Co. of U.S.A. v. United States,* 13 CIT 578, 582, 717 F.Supp. 843, 846 (1989).

█ This Court finds that the ITA had a clear obligation to grant or deny GE's APO application. There is absolutely no justification for the ITA not to act on an APO application in a timely manner. In addition, no party to this action argues that GE was not entitled to access to NTN's business proprietary information pursuant to an APO.

█ Both the ITA and Torrington argue that regardless of the ITA's failure to act, this Court should not grant GE's request to reopen the proceeding to allow GE to submit additional information in regard to NTN's date of sale submissions. All of these arguments seem to be predicated on the idea that the ITA's failure to act on GE's APO application constituted a con-

structive denial of that application. This Court is not persuaded that this is so.

The statute and the regulations set no time limit for the ITA to make a determination to grant or deny an application for an APO. The APO is only an administrative order which sets the terms and conditions under which an interested party may be granted access to proprietary information. The statute and regulations set deadlines for the ITA to determine whether *specific* information submissions will be released to an interested party pursuant to an APO. 19 U.S.C. § 1677f(c)(1)(C); 19 C.F.R. § 353.-34(b)(5).

ITA and Torrington argue that GE failed to exhaust its administrative remedies in regard to its APO application by not following up on the status of its application with the ITA. *Defendant's Memorandum in Opposition to Plaintiff's Motion for Judgment upon the Agency Record ("Defendant's Memorandum")* at 9–11; *Memorandum of the Torrington Company in Opposition to Plaintiff's Motion for Judgment on the Agency Record ("Torrington's Memorandum")* at 10–11. However, there are no administrative remedies for a situation where the ITA fails to take any action in regard to an application for an APO. The statute only requires that an APO application in correct form be presented to the ITA and GE did this. AR Jap. Pub.Doc. 67. After a proper application for an APO has been made, it is the ITA which is required to act and here it did not.

Both the ITA and Torrington also argue that GE's failure to seek statutorily required interlocutory appeal of the ITA's "denial" of GE's application precludes this Court from granting GE the relief it seeks in this case. *Defendant's Memorandum* at 8–10; *Torrington's Memorandum* at 11–13.

However, in this case the ITA took 287 days to act on Peer Bearings' APO application, 286 days to act on NTN's APO application, 125 days to act on Koyo Seiko Co.'s APO application, 81 days to act on Federal-Mogul's APO application, 50 days to act on Torrington's APO application, and 20 days to act on the McGill Manufacturing Compa-ny's APO application. AR Jap.Pub.Docs. 61, 66, 68, 153, 154, 179, 315, 498, 767, 798, 804, 829. In addition, there is no evidence on the administrative record that the ITA ever acted on APO applications made by other Japanese manufacturers who were interested parties in this review. *See* AR Jap.Pub.Docs. 109, 110, 116, 157, 158, 368. Throughout the review the ITA also made numerous decisions as to whether specific submissions of information qualified for release subject to APO's already issued. AR Jap.Pub.Docs. 774, 795, 799, 800, 804, 824, 825, 831, 832, 833, 878, 903, 908, 909, 911. When did a constructive denial of GE's application take place? Nowhere in the record is there any information as to when the ITA and Torrington claim GE's APO application was constructively denied.

The statutory scheme clearly requires that the ITA *deny* an application for an APO before an interested party can avail itself of judicial intervention. 19 U.S.C. § 1677f(c)(2). There was no actual denial of GE's application in this case and no real way for GE to know when a constructive denial had taken place when the ITA was taking anywhere from twenty days to nine months to grant APO applications.

■ Finally, the ITA and Torrington argue that the ITA's calculation of the dumping margins for NTN's purchase price sales to GE is supported by substantial evidence on the administrative record and should not be disturbed. *Defendant's Memorandum* at 11; *Torrington's Memorandum* at 14–19. This argument is misplaced. At issue here is not whether the ITA's calculation of NTN's dumping margins are correct. At issue is whether the ITA should be required to allow GE to supplement the administrative record with information regarding NTN's dates of sale to GE and to reconsider its calculation of the assessment rate for NTN's purchase price sales to GE based on such information.

GE is not totally without fault in this case. It is obvious from the administrative record that GE never did anything to follow up on the status of its APO application. After the passage of a reasonable amount of time GE might have been well advised to

petition the Court for a writ of mandamus to force the ITA to make a decision. However, on balance the majority of blame for this situation lies with the ITA's failure to act on GE's APO application.

### Conclusion

Based on the facts of this case, this Court finds that GE was not allowed to fully participate in the administrative review at issue here as was its statutory right. ITA had an obligation to act on GE's APO application in a timely manner. Therefore, this Court remands this case to the ITA to reopen the administrative record to allow GE to present information concerning dates of sale for its purchases of antifriction bearings from NTN. Torrington and Federal–Mogul will be provided an opportunity to comment on any information submitted by GE. ITA will then consider all information presented to it and conduct any recalculation of the assessment rate for NTN's purchase price sales to GE which may be warranted.